IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| GPF WAIKIKI GALLERIA, LLC, WAIKIKI GALLERIA TOWER, L.P., AND WAIKIKI GALLERIA TOWER MANAGER, LLC, as general partner of Waikiki Galleria Tower, L.P., | )<br>)<br>)<br>)<br>)<br>)<br>) | CV. NO. 07-00293 DAE-LEK |

           Plaintiffs,     )

   vs.           )

                    )

DFS GROUP, L.P.; LVMH MOET  )
HENNESSY LOUIS VUITTON, SA, )

                    )

          Defendants.    )

                    )

DFS GROUP, L.P.,         )

                    )

          Counterclaimant.  )

   vs.           )

                    )

GPF WAIKIKI GALLERIA, LLC,  )
WAIKIKI GALLERIA TOWER,   )
L.P., AND WAIKIKI GALLERIA  )
TOWER MANAGER, LLC, as    )
general partner of Waikiki Galleria )
Tower, L.P.,             )

                    )

          Counterclaim    )
          Defendants.    )

_____  )

ORDER GRANTING DEFENDANTS' MOTION TO STRIKE DECLARATION
OF KENNETH B. MARCUS; ORDER DENYING PLAINTIFFS' MOTION TO
STRIKE DEFENDANTS' EXHIBITS H AND I

On October 29, 2007, the Court heard Defendants DFS Group, L.P.

("DFS") and LVMH Moet Hennessy Louis Vuitton, SA's ("LVMH") (collectively,

"Defendants") Motion to Strike Declaration of Kenneth B. Marcus in Support of

Plaintiffs' Memorandum in Opposition to Defendants' Motion for Partial Summary

Judgment; and Plaintiffs GPF Waikiki Galleria, LLC and Waikiki Galleria Tower

Manager, LLC, as a general partner of Waikiki Galleria Tower, L.P.'s ("Waikiki

Galleria")[1] (collectively, "Plaintiffs") Motion to Strike Exhibits H and I Attached

to Defendants' Concise Statement in Support of the Motion for Partial Summary

Judgment.  Andrew S. Winer, Esq. and William Meheula, Esq., appeared at the

hearing on behalf of Plaintiffs; Thomas E. Bush, Esq., appeared at the hearing on

behalf of Defendants.  After reviewing the motions and the supporting and

opposing memoranda, the Court GRANTS Defendants' Motion to Strike and

DENIES Plaintiffs' Motion to Strike.

BACKGROUND

This case concerns a contract dispute over a lease ("Lease") that was

executed on April 1, 1999 between Nippon Shinpan U.S.A., Inc. ("Nippon

---

[1]      The Court shall refer to the landlord as "Waikiki Galleria."

2

Shinpan") and DFS for property located at 2222 and 2224 Kalakaua Avenue, Honolulu, Hawaii ("Premises"), known as the Nicos Building ("Building").[2]  On May 1, 1999, LVMH Moet Hennessy Louis Vuitton SA guaranteed that Lease, and, on October 12, 2001, Nippon Shinpan assigned its interests in the property, including its rights under the Lease, to AG Waikiki Galleria, LLC and BRS Waikiki Galleria, LLC.  On December 19, 2003, AG Waikiki Galleria, LLC and BRS Waikiki Galleria, LLC executed a Limited Warranty Deed and Assumption of Secured Obligations, transferring their interests in the property, including their rights under the Lease, to Plaintiffs.  The purpose of the Lease is "to revitalize the entire block bounded by Kalakaua Avenue, Royal Hawaiian Avenue, Kuhio Avenue and Lewers Street (the 'Block Revitalization')," including renovations and remodeling, per Article 4, Section 4.2 of the Lease.

Section 4.2.a. permits Defendants to make "material changes" to the Premises and the Building with Plaintiffs' prior written consent, which consent cannot be unreasonably withheld.  Material changes are defined as "structural changes which relate in any way to the Premises or the Building."  Section 4.3 provides that the general requirements for Defendants' improvements are detailed

---

[2]    The parties also refer to the Premises under the Lease as "The Walk" or "Waikiki Walk."

in Exhibit D.  In turn, Exhibit D sets forth the requirements for the improvements,

including a requirement that DFS "secure [Plaintiffs'] WRITTEN approval of all

Design Drawings, Working Drawings, Shop Drawings, Floor Plans and

Specifications prior to commencement of any construction" related to the

renovations.

There is a dispute surrounding the application of Section 4.3 to the

instant renovations, which incorporates Exhibit D into the Lease.  Plaintiffs argue

that Section 4.3 and Exhibit D apply, which provide more comprehensive (and

possibly more burdensome) submission and approval requirements, whereas

Defendants argue that only Section 4.2.a. applies, which requires consent for

"material changes" only.   The conflict surrounds the documents that are required,

if any, for approval of the post-construction renovations.  Namely, Plaintiffs argue

that all of the renovations must be approved according to Exhibit D, while

Defendants argue that only those renovations concerning structural changes must

be approved and that Plaintiffs are unreasonably withholding consent in light of the

documentation that Defendants already have submitted, according to Section 4.2.a.

There is conflicting evidence on both sides, with competing testimony from Bob L.

Coe, one of the negotiators of the Lease terms, and Blake Bushnell, Waikiki

Galleria's attorney who participated in the drafting of the Lease though not

4

necessarily the negotiations.[3]  The other conflicting evidence is more extensively

detailed in the Court's "Order Denying Plaintiffs' Motion for Temporary

Restraining Order and Motion to Compel; Granting DFS's Motion for Temporary

Restraining Order; Mooting DFS's Request to Toll Time to Cure; and Making No

Findings of Bad Faith or Unclean Hands," filed on June 14, 2007 ("TRO Order"),

and will be detailed in greater depth after hearing further evidence according to the

motions for partial summary judgment set for a later date.[4]

To argue that Exhibit D applies to the instant renovations, Plaintiffs

rely, in part, on expert testimony from Kenneth B. Marcus ("Marcus"), who is a

Director at Starn O'Toole Marcus & Fisher in Honolulu, Hawaii with "practice in

various real property areas including commercial and office leasing" since the mid-

1970s.  (Pls' Ex. A; Marcus's Decl. ¶ 3.)  Based on his experience, Marcus

provides his opinion of "DFS' Lease obligation to provide the landlord with

---

[3]      Bob Coe allegedly negotiated the Lease term with Waikiki Galleria's
representative Mike Sato, whose testimony is surprisingly absent (or not obvious)
from the record.

[4]      The additional evidence need not be set forth for the purpose of the
instant motions.  Some of the evidence referenced herein was submitted with
Defendants' partial motion for summary judgment and Plaintiffs' opposition
thereto.

information concerning this renovation project (the '2007 Renovation')."

(Marcus's Decl. ¶ 6.)  He was not involved in negotiating the Lease.

On the other side, Defendants rely, in part, on two letters inadvertently

produced during discovery to argue that DFS submitted the requisite

documentation to Plaintiffs in support of their renovations and that approval was

unreasonably withheld in bad faith.  The letters are addressed from Louis Fung

("Fung"), the Principal of Fung and Associates ("Fung and Associates") and

Waikiki Galleria's project architect, to Mark L. Johnson ("Johnson"), a

representative of Waikiki Galleria's managing company.  The April 13, 2007 email

indicates that Fung approved the design for the aquarium removal, which DFS

began the following month.  (Defs' Ex. H, K.)  And, that same day, Fung

commented on the Phase 1 and Phase 2 renovation plans, requiring re-submission

of the plans according to the relatively minor adjustments referenced therein.

(Defs' Ex. I.)  According to Bryon Lee ("Lee"), the Manager of Store

Development for DFS, and Defendants, neither Waikiki Galleria nor Fung and

Associates notified DFS of those comments.  (Id.; Defs' Reply at 10.)  Both of

those letters were addressed to Johnson only, as a representative of Waikiki

Galleria; DFS was not cc'd on either letter.

To date, Waikiki Galleria claims, through its expert witness, James N. Reinhardt ("Reinhardt"), the President of Architectural Diagnostics, Ltd., that the documents that DFS has provided fall short of satisfying the requirements of Exhibit D with respect to Phase 1 and Phase 2 of the renovations because the following are not included: (1) Phase 1D (JTB stairs) building permit (Part 1.A), (2) Phase 2 building permit (Part 1.A), (3) Structural calculations (Part 1.A), (4) Shop drawings (Part 1.A), (5) List of contractors and subcontractors for Phase 2 (Part III.A.1.f), and (6) a performance bond that names the landlord (Part 4.3). (Reinhard Decl. ¶ 7.b.)  Waikiki Galleria, through Reinhardt, lists the following changes to be made concerning Phase 1 and Phase 2 of the renovations, which he claims are "structural" and would require the same documents that are required for all Phase 1 and Phase 2 changes under Exhibit D:  removal of aquarium walls and supporting structure, infill of space occupied by aquarium, removal of second floor connecting bridge, removal of 5 stairways and infill of openings, installation of 4 new stairways, installation of new beams connecting to DFS Building, walk facade modifications, removal of 1 escalator, installation of two escalators, removal and installation of walls structurally attached to floors, and cutting openings in exterior walls for new exit doors.  (Reinhardt Decl. ¶ 8.)

7

Lee attests that he provided necessary plans and specifications to Waikiki Galleria in April 2007 and May 2007 through Waikiki Galleria's architect, Fung and Associates.  (<u>Lee Decl.</u> ¶ 5.)  According to Lee, the reason that certain calculations and drawings have not been submitted for Phase 1 renovations, namely, for the JTB staircase, is that the work was never completed; if it had been completed, Lee claims that he "happily" would have presented the "structural calculations and a shop drawing for the planned renovation of the JTB staircase in Phase 1," as the calculations and drawings were completed.  (<u>Id.</u> ¶ 10.)  He further attests, "[a]s it is, we are now transmitting to the Landlord structural calculations and a shop drawing, which should already be in the landlord's possession as a result of the landlord's acquisition of the records of Jay Kadowski, Inc. in this litigation."  (<u>Id.</u>)  Finally, Lee attests that he does not have a list of contractors and subcontractors for Phase 2 of the renovations because the general contractor has not been selected and the work has yet to be scheduled.   (<u>Id.</u> ¶ 11.)  When that time comes, Lee (or his firm) will submit the required material.  (<u>Id.</u>)

On August 16, 2006, Defendants filed a partial motion for summary judgment that was set for hearing on October 29, 2007.   On October 18, 2007, Defendants filed a motion to strike, and, on October 22, 2007, Plaintiffs followed suit with a motion to strike.  On October 23, 2007, Plaintiffs opposed Defendants'

motion to strike, and, on October 25, 2007, Defendants opposed Plaintiffs' motion and filed a reply in support of their motion.  Given that the motions to strike involve evidence on which the parties rely in support of or in opposition to Defendants' partial motion for summary judgement, the Court found it necessary to hear the motions to strike first.  Because of the shortness of time during which to file oppositions before the hearing, the Court reset the motion for partial summary judgment to be heard at a later time and set the motions to strike for October 29, 2007.

## DISCUSSION

Defendants seek to strike Marcus's declaration under Federal Rules of Evidence ("Fed. R. Evid.") 702, on which Plaintiffs rely for Marcus's expertise in interpreting the Lease.  Plaintiffs seek to strike two exhibits on which Defendants rely to prove Plaintiffs' bad faith, arguing that Plaintiffs' counsel inadvertently produced them during discovery.  The Court will address each motion in turn.

A.  Defendants' Motion to Strike

Defendants seek to strike Marcus's declaration because the Lease terms are unambiguous and, thus, do not require expert testimony for interpretation.  Alternatively, if the Court finds the terms to be ambiguous, Defendants seek to strike Marcus's declaration because he is not a qualified expert,

he offers only legal conclusions prohibited by law, and he fails to base his

testimony on a sufficient factual foundation under Fed. R. Evid. 702.  Plaintiffs

respond that, assuming the Court finds the Lease terms ambiguous or that it is not

prepared to make that decision at this time, Marcus's testimony constitutes proper

expert testimony to aid a trier of fact.  Accordingly, the Court first must determine

whether the Lease terms are ambiguous, which it is prepared to do at this time.  If it

finds that the terms are ambiguous, the Court then must determine whether Marcus

is a qualified expert who satisfies the requirements of Fed. R. Evid. 702.

To start, the Court finds an ambiguity in the Lease, as it did in its TRO

Order, concerning whether Section 4.3 and Exhibit D apply to post-construction

renovations.  There is no dispute that Section 4.2.a. applies to post-construction

renovations.  Section 4.2.a. provides:

> After [DFS's] plans and specifications have been
> approved, no material changes shall be made to such
> plans and specifications either during the initial
> construction or at any later time during the term of this
> Lease without the prior written consent of [Plaintiffs],
> which consent shall not be unreasonably withheld.  The
> phrase "material changes" refers to structural changes
> which relate in any way to the Premises of the Building.

Section 4.3 follows Section 4.2.a., and it is titled "Landlord's General

Requirements for Tenant Improvements."  Section 4.3 provides that "[Plaintiffs']

10

general requirements for [DFS's] improvements are detailed in Exhibit 'D,' the terms of which are hereby incorporated into this Lease," which appears to be in conflict with Section 4.2.a.  The conflict exists in that Exhibit D contains more extensive document submission and approval  requirements for the submission and approval of all renovations, not just document submission and approval related to structural changes.   If Section 4.3 is applicable to the post-construction renovations, Section 4.2.a. may be rendered superfluous.   At this stage, whether Section 4.3 was intended to apply to post-construction renovations is unclear, given the apparent conflict with Section 4.2.a., which may be explained away later. At best, the apparent conflict may suggest that Section 4.3 does not apply to post-construction renovations, or, at worst, it may trump the language in Section 4.2.a. Without interpreting the Lease terms at this time, according to the parties' intent and extrinsic evidence on the matter, the Court merely finds that an ambiguity exists.   The Court, therefore, must determine whether Marcus is a qualified expert who satisfies the requirements of Fed. R. Evid. 702.

Marcus was not involved in the Lease negotiations and, thus, he is not qualified to testify about the intent of the parties, which is the crux of the inquiry. See Bishop Trust Co., Ltd. v. Central Union Church of Honolulu, 656 P.2d 1353, 1356 (1983) ("Where the language of the contract is ambiguous, so that there is

some doubt as to the intent of the parties, that intent is a question of fact.")  Thus,

if Marcus's declaration does not touch on industry customs and practices, the

testimony in his declaration would be irrelevant.  See Hartzler v. Wiley, 277 F.

Supp. 2d 1114, 1116 (D. Kan. 2003) (noting that "[t]he touchstone of Rule 702 is

helpfulness of the expert testimony, a condition that goes primarily to relevance");

see also WH Smith Hotel Servs., Inc. v. Wendy's Intern., Inc., 5 F.3d 422, 429 (7th

Cir. 1994) (permitting expert testimony from an attorney/real estate consultant to

explain an ambiguity in a rent percentage provision in a real estate lease based on

custom and usage in the real estate industry); Hartzler v. Wiley, 277 F. Supp. 2d

1114, 1116 (D. Kan. 2003) (permitting expert testimony from a construction

program manager and consultant with an engineering and law degree to explain an

ambiguity in an agreement in light of construction industry custom and practice).

Plaintiffs rely on Hartzler and WH Smith Hotel Servs., Inc. in their opposition to

Defendants' partial motion for summary judgment and/or Defendants' motion to

strike to support expert testimony on interpretations of contract terms.  Both cases

involved testimony from expert witnesses that held a legal and another specialized

degree, which qualified them to interpret ambiguities in the agreements based on

industry customs and practices.  See WH Smith Hotel Servs., Inc., 25 F.3d at 429[5];

Hartzler, 277 F. Supp. 2d at 1116.  Unlike those cases, Marcus's only experience in

the construction industry, according to his resume, is through his legal experience

at three law firms.  He does not hold a specialized degree other than a law degree

from New York University School of Law and a bachelor's degree in economics

from Wharton School, University of Pennsylvania.  Those degrees alone would not

qualify him to discuss terms of lease agreements, in general, as they relate to the

construction industry.

Marcus does not, however, rely on his educational background alone;

rather, he relies on his years of legal experience dealing with real estate and

business transactions.  That experience, Plaintiffs argue, provides the proper legal

background to aid the trier of fact on the interpretation and the meaning of the

ambiguous Lease terms.  See Harbor Ins. Co. v. Continental Bank Corp., 922 F.2d

357, 365-66 (7th Cir. 1990); In re Ocean Bank, 481 F. Supp. 2d 892, 898 (N.D. Ill.

2007).  In Harbor Ins. Co. and In re Ocean Bank, on which Plaintiffs rely, the

courts recognized that expert testimony by a lawyer may be suitable, in some

---

[5]        Defendants highlight that Emanuel Halper, the expert witness in WH
Smith Hotel Servs., Inc., is an attorney and real estate consultant, which is not clear
from the opinion, thereby creating a stronger basis for his specialized knowledge
than Marcus's basis here.  See Defs' Ex. 1, Bush's Decl. ¶ 3; Emmanuel Halper's
CV, available at http://law.hofstra.edu/pdf/visfac_halper_vitae.pdf.

circumstances, to interpret ambiguous charters or contractual terms, but not when the lawyer's testimony is purely based on legal opinion or legal doctrines. <u>See</u> <u>Harbor Ins. Co.</u>, 922 F.2d at 365-66; <u>In re Ocean Bank</u>, 481 F. Supp. 2d at 898. For instance, in <u>Harbor Ins. Co.</u>, the Seventh Circuit determined that the district court should not have permitted a lawyer, who was a witness for insurers, to testify on the meaning of the term "indemnity" in the bank's charter because the lawyer based his testimony on his legal research. <u>See id.</u> at 366.   In doing so, the Seventh Circuit found that "the judge allowed the jury to infer that it could look to that witness for legal guidance; and by doing this the judge impermissibly tilted the balance of power between the parties toward the insurance companies." <u>Id.</u> Marcus attempts to do something similar here, undergoing a contract construction analysis to determine the intent of the parties.  (<u>Marcus's Decl.</u> ¶ 6.e.)

Courts have prohibited "expert legal opinion on questions of law" because that "interferes with the judge's role as the 'sole arbiter of the law.'" <u>McDevitt v. Guenther</u>, Civ. No. 06-00216, 2007 WL 2121241, at *17 (D. Haw. 2007); <u>see also</u> <u>United States v. Scholl</u>, 166 F.3d 964, 973 (9th Cir. 1999) (determining that expert testimony on legal conclusions, such as the reasonableness of a party's belief, are inadmissible).  Courts also "have prohibited expert opinion that applies the law to the facts, as this usurps the role of the jury." <u>McDevitt,</u>

2007 WL 2121241, at *17 (citing in support <u>Marx & Co. v. Diners' Club, Inc.</u>, 550 F.2d 505, 508-11 (2d Cir. 1977)).  In <u>Marx & Co.</u>, the Second Circuit found that the district court erred in allowing an expert witness, who was a lawyer and an expert on securities law, to construe a contract as a matter of law and providing his legal opinions on the parties' obligations.  <u>See</u> <u>id.</u> 550 F.2d at 508-10.   That is what Defendants attempt to do through Marcus's testimony in the instant case.  In essence, Marcus provides his legal opinions on DFS's obligations under the Lease based on his construction of the Lease terms.  As the Ninth Circuit has noted, "[t]he construction of written agreements belongs to the court," and witnesses should not be able to testify to the legal effect of the agreement or the "unexpressed subjective intent of the parties."  <u>Energy Oils, Inc. v. Montana Power Co.</u>, 626 F.2d 731, 737 n.11 (9th Cir. 1980).  Marcus was not part of the negotiations, nor did he review all of the relevant parties' deposition transcripts, making him unqualified to testify about the subjective intent of the parties, thus usurping the role of the jury.  Furthermore, he is not in a position, even with his legal expertise, to testify about the legal obligations of the parties in performing under terms of this specific Lease, which is within the province of the Court.

The Court recognizes that the question of intent generally is a factual question to be determined by the trier of fact, for which expert testimony may be

admissible.   See Int'l Bhd. of Electrical Workers, AFL-CIO, Local 47 v. Southern

California Edison Co., 880 F.2d 104, 106 (9th Cir. 1989) ("We have emphasized

that '[w]here a contract's meaning is not clear on its face, its interpretation depends

upon the parties' intent at the time it was executed, which is an issue for the trier of

fact.'") (citing Arizona Laborers, Teamsters & Cement Masons Local 395 Health

& Welfare Trust Fund v. Conquer Cartage Co., 753 F.2d 1512, 1515 (9th

Cir.1985)).  The Ninth Circuit has long held that experts may interpret and analyze

factual evidence.  See United States v. Scholl, 166 F.3d 964, 973 (9th Cir. 1999)

(citing United States v. Brodie, 858 F.2d 492, 496-97 (9th Cir. 1988)).

Nonetheless, typically in cases involving contract construction, experts testify on

the scope of other related agreements and/or the usage and custom pertaining to all

such agreements.  See Arizona Laborers, Teamsters & Cement Masons Local 395

Health, 753 F.2d at 1517-18.   Marcus's conclusions are not based on his

assessment of other similar agreements to clarify or to define terms of art.  Instead,

Marcus reaches legal opinions based on his construction of this Lease, making him

an advocate, not an expert.

        Plaintiffs would disagree, arguing that Marcus's knowledge is based

on his specialized knowledge of tenant improvements in commercial leases and the

customary and usual meaning given to tenant improvement provisions in

commercial leases.  That may be true, but, from Marcus's declaration, his actual testimony does not refer to customs and practices related to contract terms in the construction industry.  That distinction is fine but significant.  Marcus's testimony may be <u>based on</u> his knowledge of customary and usual meanings given to tenant improvements, which knowledge he has gained through his experience in the legal field, but his testimony <u>may not reflect</u> the customs and practices in the industry. For example, Marcus does not provide any comparisons or analysis of the Lease terms with others that would support his view, nor does he  attempt "to clarify or define terms of art, science or trade."  <u>Arizona Laborers, Teamsters & Cement Masons Local 395 Health & Welfare Trust Fund</u>, 753 F.2d at 1517-18; <u>Delta Mining Corp. v. Big Rivers Electric Corp.</u>, 18 F.3d 1398, 1402 (7th Cir. 1994) (determining, in reference to an unambiguous contract, that "[a]bsent any need to clarify or define terms of art, science or trade, expert opinion testimony to interpret contract language is inadmissible") (citing <u>TCP Industries, Inc. v. Uniroyal, Inc.</u>, 661 F.2d 542, 549-50 (6th Cir. 1981)).  Rather, he attempts to interpret the terms of the Lease based on a one-sided review of the record in a way that is favorable to Waikiki Galleria.

To illustrate, Marcus reviewed the Lease, certain plans, diagrams, calculations, and articles that Waikiki Galleria provided him, as well as Blake

Bushnell's deposition testimony, Waikiki Galleria's attorney who participated in drafting the Lease but could not testify to the intent of the parties.  (Marcus's Decl. ¶ 5.)  Significantly, Marcus did not review the deposition transcript of Bob Coe, or, if he did, that was not referenced in his declaration, who testified that Section 4.3 and Exhibit D applied to the initial construction and renovations only, and not to subsequent renovations.[6]  (Defs' Ex. E, Coe Depo. at 7-8, 39.)  On the other side, Bushnell testified that Exhibit D did not "go away" after the initial construction, particularly in regard to structural changes, without testifying about how Exhibit D applied to the instant situation.  (Pls' Ex. A at 41.)  If Marcus had compared Coe's specific testimony on the matter with Bushnell's general testimony, Marcus may have reached a different result.  Regardless, the Court finds Marcus's opinions unreliable for the purpose of the underlying motion because they are based on an insufficient factual foundation that consists of a lopsided review of the record and they do not touch on industry customs and practices through comparisons or examples.  Under these facts, Marcus is acting more as an adversary or advocate for Plaintiffs, rather than as an expert who could assist the trier of fact on a fact in issue.

---

[6]     Because Marcus reviewed extrinsic evidence, such as Bushnell's deposition transcript, to determine the intent of the parties, Defendants cannot argue that Marcus's review was confined to the four-corners of the Lease.

18

In sum, the Court finds that Marcus's attempt to interpret terms of the Lease and the parties' intent in negotiating the Lease terms amounts to nothing more than inadmissible legal conclusions or conclusions based on an insufficient factual basis.  Without more, Marcus does not qualify as an expert witness with "specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  Accordingly, the Court STRIKES Marcus's declaration.[7]

B.  <u>Plaintiffs' Motion to Strike</u>

Plaintiffs seek to strike Defendants' Exhibits H and I in support of Defendants' partial motion for summary judgment, and they request the return of all copies of those letters.  Those exhibits are letters from Fung to Johnson, approving the drawings for the aquarium removal with one minor condition and approving the plans for Phase 1 and Phase 2 of the renovations with relatively minor comments and conditions for approval upon re-submission.  Defendants obtained those letters through discovery, which Plaintiffs now claim were inadvertently produced at the expense of the client and that the totality of the circumstances in this case weighs against disclosure.

---

[7]   To be clear, the Court is not at this time ruling on Marcus's ability to testify at trial in accordance with standards appropriate for such testimony.

"The availability of the attorney-client privilege in a diversity case is governed by state law." KL Group v. Case, Kay & Lynch, 829 F.2d 909, 918 (9th Cir. 1987) (citing Federal Rules of Evidence ("Fed. R. Evid.") 501). As with federal law, under Hawaii law, the attorney-client privilege is based on common-law privilege. See Holliday v. Extex, 447 F. Supp. 2d 1131, 1137 (D. Haw. 2006). Hawaii Rules of Evidence ("Haw. R. Evid.") 503(b) provides, in pertinent part, "[a] client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client . . . (4) between representatives of the client or between the client and a representative of the client." In turn, Haw. R. Evid. 503(a)(2) defines a "representative of a client" as "one having authority to obtain professional legal services, or to act on advice rendered pursuant thereto, on behalf of the client." As clients may claim the privilege, Plaintiffs, here, rightfully are entitled to assert the privilege. See Haw. R. Evid. 503(c). Plaintiffs, as the party asserting the privilege, bear the burden of demonstrating that the privilege applies. See United States v. Gurtner, 474 F.2d 297, 298-99 (9th Cir. 1973); State v. Wong, 40 P.3d 914, 922 (Haw. 2002); DiCenzo v. Izawa, 723 P.2d 171, 176 (Haw. 1976).

20

Defendants dispute that Fung, through her firm Fung & Associates, was acting as a "representative of the client" that had the "authority to obtain professional legal services, or to act on advice rendered pursuant thereto, on behalf of the client." Haw. R. Evid. 503(a)(2). Defendants further contest that the letters constitute "confidential communications made for the  purpose of facilitating the rendition of professional legal services." Haw. R. Evid. 503(b). Accordingly, the Court may not reach Plaintiffs' arguments that the letters were inadvertently disclosed until after it first conducts an "inquiry into the existence and validity of the privilege[.]" DiCenzo, 723 P.2d at 176 (citing Sapp v. Wong, 609 P.2d 137, 140 (1980)).

There is no dispute that Johnson is a representative of Waikiki Galleria's managing company, The Mills Group. Rather, the dispute surrounds Fung's status as a representative of Waikiki Galleria. Fung would constitute such a representative only if Radovich advised Johnson to obtain the requested information from her or her firm for the purpose of rendering legal services. If Fung is not a representative of Waikiki Galleria, in the first instance, then Haw. R. Evid. 503(b)(4) will not apply.

In a letter to Fung dated April 3, 2007, Johnson, who was acting in his capacity as a representative of Waikiki Galleria, though not necessarily pursuant to

legal advice, asked Fung, as the project architect, to "review and comment on the[]

plans." (Defs' Ex. X.)  The letter did not indicate that Johnson acted on the advice

of Waikiki Galleria's counsel, Scott Radovich.[8]  Johnson merely stated, in an email

dated April 12, 2007, that he required the comments "to give DFS some sort of

response by mid to late next week," suggesting that he was requesting the

comments to aid in his response to DFS the following week, not for the purpose of

furthering Plaintiffs' legal services per Radovich's advice.  (Defs' Ex. G.)  See,

e.g., DiCenzo, 723 P.2d at 176 (looking to whether a statement was made at the

request of or per the guidance of counsel).  Although Johnson now attests that the

communications with Fung were related to Waikiki Galleria's legal review of

DFS's request for approval (and, overall, the furtherance of the rendition of legal

services), with Fung attesting the same, the documentary evidence suggests

otherwise.  (Johnson's Decl. ¶ 3; Fung's Decl. ¶¶ 3, 4.)

Besides the email dated April 12, 2007, the Court finds persuasive an

email dated January 31, 2007 from Johnson to Sharon Weiner ("Weiner"), DFS's

Vice President of business development, indicating that Radovich (or another

---

[8]     Plaintiffs note that, in January 2007, Radovich began representing
Plaintiffs on DFS's request for approval but that William Meheula ("Meheula"),
with Winer Meheula & Devens, was the lead counsel personally responsible for
reviewing the documents to be produced during discovery later in 2007.  Plaintiffs
also note that DFS was aware that Radovich had been obtained as counsel.

attorney) was not involved in the plan review.[9]  (Pls' Ex. 28; Johnson's Decl. ¶ 8.) (emphasis added.)   The plan was for Radovich (or Meheula) to be involved in reviewing the impact that DFS's plans may have had on the "process and requirements related to the Lease," not in reviewing the impact that Fung's review of the "area calculations and other technical matters" may have had on those processes and requirements to assist Johnson with his response to DFS the following week.  (Id.)  That email, with the April 12, 2007 email, suggests that, contrary to Fung and Johnson's current assertions, Fung was not acting at the direction of counsel, once removed through Johnson, when she offered her comments.  Rather, she offered them for the purpose of reviewing and commenting on DFS's plans to assist Johnson in responding to DFS the following week (without the assistance of counsel).  Cf. United States v. Gurtner, 474 F.2d 297, 298-99 (9th Cir. 1973) (determining that the defendant's consultations with a private accountant for the purpose of preparing tax returns were not protected

---

[9]     The exact language of the email from Johnson to Weiner follows:

Our attorney will not be involved with the actual plan review, rather he will assist us in reviewing the process and requirements related to the lease and impact your [referring to DFS's] plans may have thereon.  We will likely ask a consulting architect to review and assist us regarding area calculations and other technical matters.

communications).  Notably, unlike the declarations, both of those emails were sent close to the time of the request for review, thus providing the Court with a more accurate view of the purpose of Fung's request at the time that the request was made.

Plaintiffs would disagree with the Court's interpretation, arguing that the letters were privileged and confidential communications that Radovich intended to use to facilitate his legal services.  (Johnson's Decl. ¶¶ 5-6.)  Johnson claims that his request of Fung was based on his prior attorney-client communications with Radovich related to DFS's request for approval.  (Johnson's Decl. ¶ 6.)  The only evidence that Plaintiffs, through Johnson, present in support are three email communications, including the January 31, 2007 email, suggesting a different interpretation of that email that is favorable to Plaintiffs.  Namely, Plaintiffs argue that the decision to have their attorney assist with a review of the process and the requirements related to the Lease includes Fung's letters, which, they argue, means that Fung's communications were made at the request of counsel to aid in counsel's legal services.  The Court does not read the email that way.  Rather, the Court reads the email, as do Defendants, indicating that Radovich was not to be involved in the actual plan review, as stated, but only in the later stages when interpreting the Lease and the impact of DFS's plans on the Lease

24

requirements.  Granted, Radovich likely took Fung's letters into consideration when conducting his review, but that does not mean that Fung's communications were made <u>per Radovich's request or guidance</u> for the <u>purpose</u> of facilitating his review.

The February 20, 2007 and the April 3, 2007 emails likewise do not reflect that Johnson was acting on Radovich's advice.  In those emails, Johnson merely asks Weiner to submit DFS's plans directly to his office and to Fung and Associates.  Defendants contend that the emails, with the prior information concerning Radovich's retention as counsel in January 2007, conveyed to DFS that Radovich and Fung would be jointly assisting Plaintiffs in determining whether DFS was in compliance with the Lease.  The Court does not agree, as the January 31, 2007 email plainly noted the different roles that each party would play at different stages of the review and the subsequent emails indicated that plans should be submitted to Johnson and Fung only, with no mention of Radovich (or his request for the information, if he indeed made one).[10]  As the Ninth Circuit has

---

[10]     That Radovich was cc'd on the January 31, 2007 email and the April 3, 2007 email does indicate that Johnson made the request per Radovich's advice for the furthering of his legal services.  The cc only indicates that Johnson wanted Radovich to be aware that he was making the request, on his own accord, most likely to keep him informed of the decisions that he was making.

25

long held, "[b]ecause it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed." Weil v. Investment/Indicators, Research & Management, Inc., 647 F.2d 18, 24 (9th Cir. 1981).   "For that reason, the attorney-client privilege 'applies only where necessary to achieve its purpose.'" United States v. Taleo, 222 F.3d 1133, 1140 (9th Cir. 2000) (quoting Fisher v. United States, 425 U.S. 391, 403 (1976)).  The purpose being to encourage clients to have full and frank disclosures to their attorneys to obtain legal assistance.   See Fisher, 425 U.S. at 403.  Based on the documentary evidence, the Court finds that the attorney-client privilege does not apply here to protect the disclosure of Fung's letters because the evidence suggests that Johnson made the request for his own benefit to determine how to respond to DFS the following week, not per the advice of counsel for the purpose of facilitating legal services.   Accordingly, the Court finds that Fung was not acting as a representative of Waikiki Galleria, according to Radovich's legal advice, when she conducted her review and commented upon DFS's plans, under Haw. R. Evid. 503(a)(2).

For similar reasons, the Court finds that Fung's letters were not made "for the purpose of facilitating the rendition of professional legal services to" Waikiki Galleria under Haw. R. Evid. 503(b).  See Holliday v. Extex, 447 F. Supp. 2d 1131, 1136-37 (D. Haw. 2006) (setting forth the elements to satisfy the

26

requirements of Haw. R. Evid. 503(b), including that the communications must be sought for the purpose of seeking legal advice).  As the Court found, the evidence suggests that Johnson was not acting at the direction of legal counsel when he requested Fung to review DFS's documents.  Moreover, that Meheula monitored document production in late 2007 does not suggest that Fung's review and comments were made for the purpose of seeking legal advice.  Meheula attests that he personally reviewed the documents that Plaintiffs and Fung & Associates provided to him for the purpose of withholding privileged documents.  The two letters in Exhibits H and I apparently slipped his attention until he read Defendants' Separate and Concise Statement in support of their reply to their partial motion for summary judgment, filed on October 18, 2007.  (Id. ¶ 5.)  The Court does not doubt that Meheula intended for the letters to remain confidential and undisclosed for the purpose of discovery.  Confidentiality alone, however, will not protect the communications, as communications must have been "made for the purpose of facilitating the rendition of professional legal services" under Haw. R. Evid. 503(b), which the Court finds is not what occurred here.[11]

---

[11]   Indeed, had the documents at issue been withheld, that failure to disclose very well may have been improper.

The Court further finds that, even if Fung's letters contained in Defendants' Exhibits H and I were protected communications under the attorney-client privilege, the inadvertent disclosure would have waived that privilege under the totality of the circumstances test that Hawaii courts follow.  See Sunset Beach Coalition v. City & County of Honolulu, 78 P.3d 1, 22 (Haw. 2003).  "Under such an approach, a court may consider the following factors: '(1) the reasonableness of precautions taken to prevent disclosure; (2) the amount of time taken to remedy the error; (3) the scope of discovery; (4) the extent of the disclosure; and (5) the overriding issue of fairness.'"  Id.  Here, Plaintiffs argue that (1) because lead counsel (Meheula) personally reviewed the documents to be produced, (2) the instant motion was filed within five days of discovering the error, (3) an excessive amount of documents were produced (approximately 50,000 pages, with Plaintiffs producing over 9,000 alone), (4) the extent of the disclosure was minimal, as other copies were withheld, and (5) Plaintiffs overall made "good faith efforts" to keep the letters confidential, Plaintiffs did not waive the attorney-client privilege.  Defendants do not respond to this argument because they believe that the letters do not constitute privileged communications, in the first instance.

The Court disagrees with Defendants.  Given that Meheula personally reviewed the documents to be produced in discovery, he reasonably could have

28

identified the copies of the letters that were produced, particularly as he was

careful not to disclose other copies of it.  In fact, having recognized the

significance of the letters, he should have been more careful in guaranteeing that

the letters did not escape his review through an additional review, assigning

someone to look for those letters specifically or to look for them himself to

guarantee that they would be withheld.   The Court recognizes that Meheula had a

difficult task of reviewing thousands of documents, but others could have assisted

him in that regard, if they had not already.

Additionally, Plaintiffs only attached a privilege log to their reply in

response to Defendants' opposition to the instant motion.  (Reply at 7-8.)

Plaintiffs' reason for the delay was the "fast pace" at which this case has

proceeded, but, the Court notes that it issued its temporary restraining order on

June 14, 2007.  By that point, Plaintiffs should have expected motions to follow, to

which Defendants likely were to attach evidence that had been produced during

discovery.  Moreover, in an email dated September 7, 2007 that Meheula sent to

Thomas Bush of Alston, Hunt, Floyd & Ing, Meheula stated "I have reviewed the

Fung documents and we will probably be withholding several documents on the

grounds of attorney-client and work product.  The balance will be produced to

you." (Meheula Decl. ¶ 4.)  That email was sent before Defendants attached

Exhibits H and I as exhibits in support of their reply, filed on October 18, 2007.

Reasonably prudent attorneys would have submitted a privilege log shortly

thereafter to protect any inadvertently disclosed documents, recognizing that such

documents may exist (and even may have slipped their attention during discovery).

The failure, at the very least, to produce a privilege log after expressly

acknowledging that privileged communications exist and before Defendants had

the opportunity to use such "privileged" material in support of their motion

demonstrates a failure to take reasonable precautions to keep the communications

protected.  Consequently, at best, from the time that the Court issued its temporary

restraining order, Plaintiffs had well over three months to produce a privilege log

to inform Defendants of their intentions, and, at worst, they had over a month to

file it from the date on which Meheula explicitly acknowledged that Plaintiffs

planned to withhold documents based on the attorney-client privilege.[12]

Furthermore, to prove that the letters were intended to remain

confidential, and that the disclosure was minimal, Meheula attests that other copies

---

[12]    The Court notes that that is the best and the worst case scenario for Plaintiffs, as Plaintiffs could have filed their privilege log at the time (or even before) they produced the documents during discovery.

of the same letters were withheld and only one copy was produced to Defendants' counsel.  (<u>Meheula Decl.</u> ¶ 5)  Nonetheless, the Court finds that the extent of the disclosure was not minimal, as the disclosure was made during discovery to Defendants' entire legal team, with discovery of such error only occurring when that team used the evidence against Plaintiffs.  Again, anticipating that motions would be filed, Plaintiffs should have, at least, produced a privilege log to try to help to minimize any harm or, at most, reviewed the evidence that they produced again to make sure that they did not produce any privileged documents that could be used against them during the dispositive motions phase.

Finally, although Plaintiffs argue that, in fairness, the inadvertent disclosure should not waive the privilege because of their good faith efforts, the Court disagrees.  While Plaintiffs' efforts to preserve the privilege may have been made in good faith, the consequences of their carelessness prevails here to waive the privilege, assuming, of course, that the letters were privileged in the first place, which the Court found that they were not.

## CONCLUSION

For the reasons stated above, the Court GRANTS Defendants' Motion to Strike; DENIES Plaintiffs' Motion to Strike.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, October 30, 2007.



_____
David Alan Ezra
United States District Judge

GPF Waikiki Galleria, LLC, et al. vs. DFS Group, L.P., et al., Civil No. 07-00293 DAE-LEK; ORDER GRANTING DEFENDANTS' MOTION TO STRIKE DECLARATION OF KENNETH B. MARCUS; ORDER DENYING PLAINTIFFS' MOTION TO STRIKE DEFENDANTS' EXHIBITS H AND I